## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

## CIVIL MINUTES – GENERAL

| Case No. | LA CV11-10279 JAK (SPx) | Date | May 20, 2014 |
|---|---|---|---|
| Title | Estate of Dominic Salazar, et al. v. United States of America, et al. | | |

Present: The Honorable    JOHN A. KRONSTADT, UNITED STATES DISTRICT JUDGE

| Andrea Keifer | Not Reported |
|---|---|
| Deputy Clerk | Court Reporter / Recorder |
| Attorneys Present for Plaintiffs: | Attorneys Present for Defendants: |
| Not Present | Not Present |

Proceedings:        (IN CHAMBERS) MEMORANDUM OF DECISION re BENCH TRIAL (JS-6)

### I.    Introduction

Mary Salazar and the Estate of Dominic Salazar ("Plaintiffs") brought this wrongful death action against the United States under the Federal Tort Claims Act ("FTCA").[1] This claim arises from the death of Dominic Salazar ("Salazar"), which occurred during an attempt by DiPaolo and Walton to arrest him. The attempted arrest occurred at a time that Salazar was a fugitive due to his failure to appear for sentencing on the date ordered by the District Court. The date had been set when the District Court accepted Salazar's plea of guilty to a charge of possession of child pornography. Plaintiffs contend that DiPaolo and Walton breached the duty to use reasonable care in connection with the attempted arrest of Salazar and that this caused his death.

A bench trial in this matter was conducted on February 4, 2014. Thereafter, consistent with their stipulation at the close of the trial, each party filed a written, closing argument. Defendant's Post-Trial Brief (Dkt. 119); Plaintiffs' Post-Trial Brief (Dkt. 118). At the request of the Court, and without objection by either party, Defendant also filed copies of certain investigative reports about the incident as well as the recording of a 9-1-1 telephone call that was placed shortly after the events at issue here. Dkt. 117. Based on these filings and the evidence presented at trial, this Memorandum of Decision sets forth findings of fact and conclusions of law with respect to Plaintiffs' claim. Fed. R. Civ. P. 52(a).

For the reasons stated in this Memorandum, Plaintiffs have failed to demonstrate by a preponderance of the evidence that the Deputy Marshals breached their duties to Salazar through the actions that they took in connection with the attempted arrest. These actions included the use of deadly force. Therefore, judgment shall be entered for Defendant.

---

1 Plaintiff's initial complaint (Dkt. 1) named additional defendants: the United States Marshal Service, and U.S. Marshals David M. Singer ("Singer"), Jason DiPaolo ("DiPaolo"), and Adrian Walton ("Walton"). Prior to trial, Plaintiffs' claims against Singer, DiPaolo, and Walton were dismissed with leave to amend. Dkt. 49. Plaintiffs' Second Amended Complaint excluded these defendants.

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**

**CIVIL MINUTES – GENERAL**

| Case No. | LA CV11-10279 JAK (SPx) | Date | May 20, 2014 |
|---|---|---|---|
| Title | Estate of Dominic Salazar, et al. v. United States of America, et al. | | |

**II.    Pre-Trial and Trial Procedures**

The parties presented trial evidence through live testimony, declarations and exhibits. Prior to the trial and consistent with the Court's orders, each of the parties submitted proposed direct testimony of witnesses through declarations. Each of the parties was permitted to make evidentiary objections to the declarations offered by an opposing party. The Court ruled on these evidentiary objections prior to trial. Dkt. 107, 108, 109, 110, 111, 112. At the trial, each declarant was made available for cross-examination and re-direct examination.

Declarations of the following witnesses were presented by the parties prior to trial:

By Plaintiffs: Courtney Saldana (Dkt. 91); Pamela Sanchez (Dkt. 89); Mary Salazar (Dkt. 88); and William Flynn (Dkt. 90).

By Defendant: DiPaolo (Dkt. 79); Walton (Dkt. 80); U.S. Marshal Chief of Basic Operations Anthony Ross (Dkt. 81); and U.S. Marshal Acting Chief of Basic Programs Paul Duffy (Dkt. 105).[2]

All of these witnesses, except Mary Salazar and Anthony Ross, testified at the trial.

**III.    Findings of Fact**

    **A.    Summary of the Evidence Presented and Assessment of Witnesses**

        1.    Overview

            a.    The Undisputed Facts

In May 2008, Salazar pleaded guilty to one count of possession of child pornography in violation of 18 U.S.C. § 2252A(a)(5)(B). At that hearing, the District Court ordered him to appear for sentencing on March 9, 2009. Salazar failed to appear as ordered. As a result, a warrant for his arrest issued. Ex. 50. In March 2009, Deputy DiPaolo was assigned to apprehend Salazar. However, DiPaolo did not begin his investigation into how to effect the arrest until early May 2009. At that time, DiPaolo determined that Salazar's name was associated with a residence located at 15015 Fox Ridge Drive (the "Fox Ridge Residence"). This address did not match the one for Salazar that was on file with the U.S. Marshal Service ("USMS"). From his investigation and review of the case file, DiPaolo determined that Salazar did not have any violent criminal history and that no weapons were registered in his name. DiPaolo also learned that Salazar was a graduate of California State Polytechnic University ("Cal Poly") and that he was employed by United Parcel Service ("UPS").

As the next step in the process, on May 6, 2009, DiPaolo and Walton drove to the Fox Ridge Residence. They planned to conduct surveillance to determine if Salazar lived there; they did not plan to attempt or

---

2 Duffy replaced Ross as a declarant and trial witness due to an unexpected family emergency that prevented Ross from travelling to Los Angeles for the trial. Dkt. 105 at 1 n.1. Plaintiff did not object to this substitution.

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**

**CIVIL MINUTES – GENERAL**

| Case No. | LA CV11-10279 JAK (SPx) | | Date | May 20, 2014 |
|---|---|---|---|---|
| Title | Estate of Dominic Salazar, et al. v. United States of America, et al. | | | |

make an arrest.[3] They drove a Government-owned, unmarked silver minivan. Both were dressed in plain clothes as was their custom and practice when conducting surveillance. On the drive to the Fox Ridge Residence, Walton reviewed Salazar's case file. After driving past the Fox Ridge Residence, DiPaolo parked the minivan at a location that was several houses away so that they could observe activity at the Fox Ridge Residence with less likelihood of being noticed. Both Deputies observed a four-door Infinity G35 ("Infinity") parked in the driveway of the Fox Ridge Residence. The vehicle had a Cal Poly license frame.

During this initial surveillance, DiPaolo called the Pretrial Services office of the District Court to confirm that the warrant was still outstanding. He also checked the license plate number of the Infinity, and determined that the vehicle was registered to Salazar. Further, he spoke with the FBI agent who arrested Salazar after he committed the underlying offense. This conversation led DiPaolo to conclude that Salazar would be non-violent and cooperative.

DiPaolo and Walton remained in their vehicle observing the Fox Ridge Residence for approximately two hours. During this time, they did not see any movement in or out of the house. At some point during these two hours, the Marshals formulated a new plan: They would apprehend Salazar in the open, *i.e.*, not in the house or in the vehicle, if they saw him emerge from the Fox Ridge Residence. After two hours, when there had been no activity at the Fox Ridge Residence, they decided to return on another day with additional deputies to make the arrest. They would use the additional personnel as part of the planned arrest of Salazar in his home.

As they were about to leave, the Marshals observed a person, whom they determined to be Salazar, leave the Fox Ridge Residence and walk toward the Infinity. Each Marshal testified that he recognized Salazar from the USMS photo on file. DiPaolo and Walton then decided to apprehend Salazar before he reached the Infinity. DiPaolo drove the minivan to the driveway of the Fox Ridge Residence; he parked it in a manner that blocked the driveway so that the Infinity could not leave. By the time the Marshals exited the minivan, Salazar had entered the Infinity, but its engine was not running. DiPaolo then approached the driver's side door, while Walton approached the passenger side of the vehicle. DiPaolo pulled on the driver's side door handle, but the door was locked.

Each Marshal testified that by looking through the tinted windows of the Infinity, he could observe Salazar sitting in the driver's seat. Each testified that Salazar was not moving, that he had both hands on the steering wheel and that he was staring straight ahead. Each also testified that both ordered Salazar to exit the vehicle several times, but did not shout or yell their commands. They also testified that Salazar did not respond to these commands, and continued to stare straight ahead with his hands on the steering wheel.

The Marshals then heard the Infinity's engine start and observed that Salazar had placed the car into reverse. They next observed Salazar move his head as if he would be looking in the rear view mirror. But, they then noticed that Salazar shifted the Infinity into park. When he did so, DiPaolo heard the doors of the car unlock. He immediately opened the driver's side door and ordered Salazar to exit the vehicle.

---

3 Plaintiffs' expert, William Flynn, contends that the Marshals intended to apprehend Salazar if they saw him that day.

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**

**CIVIL MINUTES – GENERAL**

| Case No. | LA CV11-10279 JAK (SPx) | | Date | May 20, 2014 |
|---|---|---|---|---|
| Title | Estate of Dominic Salazar, et al. v. United States of America, et al. | | | |

However, Salazar continued to stare straight ahead with his hands on the steering wheel. He was not compliant with DiPaolo's commands.

DiPaolo then attempted to pull Salazar from the vehicle by grabbing his neck and left arm. He also continued to order Salazar out of the Infinity; Salazar continued to grasp the steering wheel and did not comply with DiPaolo's orders. DiPaolo could not pull Salazar out of the vehicle. Walton then holstered his weapon and ran around the back of the Infinity to join DiPaolo at the driver's side door area so that he could assist DiPaolo. Walton then switched spots with DiPaolo and reached into the Infinity in an attempt to remove Salazar. Walton told Salazar several times to leave the vehicle. After a few seconds, while Walton was still attempting to pull Salazar from the vehicle, Salazar released his grip on the steering wheel and leaned towards the passenger side of the vehicle. Immediately thereafter, Walton saw that Salazar was holding a handgun in his right hand and that he was moving it upward from the center console. Walton then quickly backed away from the driver's side door of the Infinity.

At that time, DiPaolo drew his weapon from his holster and moved in front of Walton. He then saw that Salazar was holding a gun in his right hand. DiPaolo testified that Salazar was moving the gun from the right side of his body toward the driver's side of the vehicle, in the direction of the Deputies. At that moment, DiPaolo states that he believed Salazar posed a serious, imminent threat to the safety of Walton and himself. Thus, he believed Salazar intended to shoot either one or both of them. DiPaolo said, "Drop the gun," and then discharged his weapon approximately three times. Although Salazar stopped moving, he then suddenly jerked the gun up. At that point, DiPaolo discharged his weapon at least one more time. Salazar then dropped the gun in the passenger seat floorboard and stopped moving.

DiPaolo continued to cover Salazar at gunpoint while Walton called the USMS and requested local law enforcement and emergency medical assistance. Walton then kept his weapon drawn and pointed it toward Salazar while DiPaolo walked to the unmarked minivan to retrieve his raid jacket.[4] DiPaolo then returned to the Infinity, removed Salazar's handgun from the passenger seat, and placed it on the driver's seat of the minivan. Ex. 63.

> b.    The Disputed Facts

Three key matters are in dispute:

> First, whether the Deputy Marshals were wearing badges and whether they properly identified themselves as law enforcement when they approached the vehicle and made orders to Salazar. Both Marshals contend they were wearing badges over their shirts and verbally identified themselves several times to Salazar as law enforcement. Plaintiffs have submitted evidence in the form of witness and expert testimony to the contrary.

> Second, whether the Deputy Marshals followed established police practice in the manner in which they chose to seek to arrest Salazar.

---

4  A "raid jacket" is issued to Deputy Marshals. The words "U.S. Marshals" and "Police" appear on the back of the jacket together with identifying lettering and insignia on both the sleeves and the front of the jacket.

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**

**CIVIL MINUTES – GENERAL**

| Case No. | LA CV11-10279 JAK (SPx) | Date | May 20, 2014 |
|---|---|---|---|
| Title | Estate of Dominic Salazar, et al. v. United States of America, et al. | | |

Third, whether the Deputy Marshals exercised reasonable care in the conduct that led to the use of deadly force as well in the use of such force. Defendant asserts that the Deputies' "preshooting conduct" was discretionary and, therefore, cannot form the basis of liability for the resulting use of force. They also contend that DiPaolo's decision to use deadly force was justified by the serious, imminent threat posed by Salazar. Plaintiffs dispute both of these positions.

      2.    <u>Summary of Plaintiffs' Presentation</u>

The evidence presented by Plaintiffs was offered to support the claim that DiPaolo and Walton did not act with reasonable care with respect to: (1) the manner in which they conducted surveillance of Salazar prior to the attempt to arrest him; (2) their decision to seek to arrest Salazar that day rather than to follow the original plan to do so at a later date when a greater number of law enforcement personnel would be present; (3) the manner in which they approached Salazar's vehicle, including their alleged failure properly to identify themselves as law enforcement personnel and their conduct that preceded and resulted in the use of deadly force; and (4) their decision to proceed to use force in an attempt to remove Salazar from the vehicle rather than keeping his vehicle blocked, monitoring him and calling for additional law enforcement personnel to come to the location to cause Salazar to surrender.

In support of these positions, Plaintiffs offered evidence to support the following claims:

(a) Neither DiPaolo nor Walton verbally identified himself to Salazar as a law enforcement officer when they approached and stood next to his vehicle;

(b) DiPaolo was not wearing his badge during the encounter with Salazar;

(c) DiPaolo and Walton did not follow established law enforcement practices in any of the following actions: choosing to change their initial plan from surveillance in plain clothes to confirm the location of Salazar's residence to an attempt to arrest him; deciding to approach Salazar after he was in his vehicle rather than using a loudspeaker or "felony stop" method; and failing to wear raid jackets, and in DiPaolo's case, a badge, at the time that they approached the vehicle.

      3.    <u>Summary of Defendant's Presentation</u>

The evidence presented by Defendant was offered to support the following claims:

(a) DiPaolo and Walton acted within their discretion in selecting the manner in which to conduct surveillance of Salazar's residence, approach Salazar's vehicle, and identify themselves to him by showing their badges and stating their identities and why they were present.

(b) DiPaolo's use of deadly force was reasonable under the circumstances because he was in fear for both his life and the life of Walton.

In support of these positions, Defendant offered the following evidence:

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**

**CIVIL MINUTES – GENERAL**

| Case No. | LA CV11-10279 JAK (SPx) | Date | May 20, 2014 |
|---|---|---|---|
| Title | Estate of Dominic Salazar, et al. v. United States of America, et al. | | |

(a) Each Deputy Marshal was wearing his badge outside of his shirt when he approached Salazar's vehicle.

(b) Both Marshals identified themselves as law enforcement in loud voices and issued repeated directives to Salazar to exit his vehicle.

(c) As Deputy Walton was attempting physically to remove Salazar from the Infinity, he saw a gun in Salazar's right hand. After he yelled "Gun," DiPaolo moved in front of Walton, and saw Salazar moving the barrel of the gun in the direction of DiPaolo and Walton.

(d) Deputy DiPaolo was in fear for his life as well as Deputy Walton's, when he fired his weapon at Salazar.

(e) Deputy Marshals have broad discretion when determining how to make an arrest.

   **B.     The Witnesses[5]**

      1.    Courtney Saldana

Saldana lived next-door to the Fox Ridge Residence at the time of the incident. Saldana was an extremely credible witness. Her recollections were clear and consistent.

            a.        In her declaration, Saldana states the following:

   1. On May 6, 2009, Saldana was in a room on the first floor of her residence with a window open. The open window faced the Fox Ridge Residence.
   2. She was on the phone with her husband when she heard what sounded like arguing.[6]
   3. She could clearly hear an individual yelling "Get out of the car! Get out of the fucking car!"
   4. During the telephone conversation with her husband, she told him that it sounded like someone had been caught joyriding.
   5. She did not distinctly hear anyone identify himself as a law enforcement officer or yell, "Gun."
   6. She heard a loud noise that she believed to be a car backfiring. Her husband responded that it was not a car.
   7. She then went into the bathroom to hide.

            b.        Saldana testified to the following at trial:

   1. Ex. 67 and Ex. 57 show where Saldana's house is located relative to the Fox Ridge Residence.
   2. On May 6, 2009, Saldana had been in the first floor room for "a few hours" prior to hearing

5 The following description of the testimony of the witnesses focuses on the disputed facts. It does not summarize all of the testimony provided in the pre-trial declarations or at trial.
6 At trial, Saldana characterized the sounds she heard as "orders."

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**

**CIVIL MINUTES – GENERAL**

| Case No. | LA CV11-10279 JAK (SPx) | Date | May 20, 2014 |
|---|---|---|---|
| Title | Estate of Dominic Salazar, et al. v. United States of America, et al. | | |

noises outside. She testified that she was not sure whether, in general, from her position in that room she could hear every sound from the street. She could not see Salazar's driveway from the room where she was sitting because her direct view was blocked by a brick wall that extended from the front to back of her property along the property line shared with the Fox Ridge Residence.

3. Saldana was on the phone with her husband when she heard male voices arguing and went to her window so that she could better hear what was being said.

4. Five to six seconds later she heard someone say "Get out of the car. Get the fuck out of the car!" She recalls only one, male voice.[7] She testified that she could clearly hear this command because it was louder than anything else that had been said previously.

5. Ten to 15 seconds after she heard the "Get out of the car" order she heard the car "backfire." She later learned that this was the sound of one or more gunshots.

6. Although she heard "arguing" and the "Get out of the car" order, she did not hear anyone identify himself as a law enforcement officer. This is supported by her recollection that she thought a juvenile had been caught "joyriding" by his or her parents.

    2.   <u>Pamela Sanchez</u>

Since 2006, Sanchez has resided at 15002 Fox Ridge Drive, which is across the street from the Fox Ridge Residence. Sanchez was generally a credible witness; however, there were some inconsistencies in her testimony. For example, Sanchez told a Fontana police officer that she had called 9-1-1 to "make sure" that those she observed across the street "were officers." At trial, she testified that she called 9-1-1 because she was frightened and did not think the men she saw across the street were police officers. Defendant also raised the question whether Sanchez was biased based on her relationship with the Salazar family. Sanchez testified that she went to Salazar's vigil or wake, spoke on the phone with Salazar's sister several times after May 6, 2009, and that she "felt bad for the family." However, this evidence had no effect on the credibility of her testimony.

    a.      In her declaration, Sanchez states the following:

1. Sanchez was watering plants on her front yard and did not notice any activity across the street.

2. After her husband called for her, she went inside the house, but left the door open.

3. After entering the house, she heard several loud noises that sounded like gunshots.

4. Sanchez and her husband ran outside and saw two men pointing guns at an individual in a car that was parked in the driveway across the street. The two gunmen stood on opposite sides of the car.

5. She did not hear anything prior to the gunshots, and did not see any indication that the men with guns were law enforcement officers, *e.g.*, badges, uniforms, flashing lights on their vehicle, so she ran upstairs.

6. She then called 9-1-1.

7. From upstairs, she saw her neighbor approach the gunmen, yell something to them, and go

---

7  Saldana previously told the Fontana police department that she heard two voices.

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**

**CIVIL MINUTES – GENERAL**

| Case No. | LA CV11-10279 JAK (SPx) | Date | May 20, 2014 |
|---|---|---|---|
| Title | Estate of Dominic Salazar, et al. v. United States of America, et al. | | |

back towards his house.[8]
8. She then saw one of the gunmen walk to a van and put on a jacket and place a badge around his neck.
9. One of the men opened the car door, and she could then see Salazar's body.

b.       Sanchez testified to the following at trial:

1. Ex. 70 is an aerial view of Sanchez's house in relation to the Fox Ridge Residence.
2. Sanchez confirmed that she noticed nothing out of the ordinary when she was outside watering the plants. She did not see the minivan that was used by the Marshals.
3. Sanchez was 15-20 feet inside of her house when she heard 4-5 gunshots. Only a few seconds elapsed between when she was outside and when she heard the gunshots.
4. Sanchez then ran into her front yard and saw the men with guns on either side of the car.[9]
5. When she called 9-1-1, the operator told her the gunmen were law enforcement officers, and at that point she observed "the bald one" (DiPaolo) walk to the van, put on what she presumed was his badge, and his raid jacket. Sanchez was asked repeatedly whether she saw DiPaolo put on his badge. She responded clearly and consistently that she saw him put on two items: the jacket and something on a chain that he put around his neck.[10]
6. Sanchez did not hear anyone identify himself as a law enforcement officer. However, she also did not hear anything prior to the gunshots.
7. Ex. 71 is an audio recording of Sanchez's interview with a Fontana police officer.

3.       William Flynn

Plaintiffs called Flynn as an expert witness. He was an officer with the West Covina Police Department from 1968-1988. Six years of his career were spent investigating officer involved shootings. He has been qualified as an expert in federal courts on cases involving police practices and procedures, police officer misconduct, excessive force, wrongful death, and surveillance techniques. Flynn was a credible witness; however, some of his opinions were stricken because they were not expressed as opinions, but as re-statements of information in the Fontana police reports and the trial declarations.

a.       In his declaration, Flynn presented the following opinions:

1. When officers seek to remove a suspect from a vehicle in order to arrest the person, they face the same level of danger as if they were seeking to remove the same person from a residence

---

8 This statement appears in Sanchez's declaration; however, Plaintiffs did not submit any other evidence at trial with respect to this recollection.
9 Sanchez's recollection that each of the men was on a different side of Salazar's vehicle after the shots were fired, and that the doors to the car were closed, is inconsistent with the testimony of both Deputies that they were on the same side of the car and that the driver's side door of the Infinity was open at the time of the shooting.
10 DiPaolo testified that his badge was already around his neck when he approached Salazar's vehicle, but that he "adjusted" it as he walked back to the van after the shooting. Sanchez could not remember exactly what motion DiPaolo made when he "put on his badge," but she was quite firm and persuasive in her belief that she saw him put on two items, not one.

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**

**CIVIL MINUTES – GENERAL**

| Case No. | LA CV11-10279 JAK (SPx) | Date | May 20, 2014 |
|---|---|---|---|
| Title | Estate of Dominic Salazar, et al. v. United States of America, et al. | | |

for the same purpose. The same safety issues arise in both situations as to the arresting officers and civilians who are present in the vicinity of such law enforcement activities.

2. Upon learning that the Infinity was registered to Salazar, DiPaolo and Walton had enough information to determine that he lived at the location under surveillance. Therefore, they should have adhered to the original plan -- return on a later day with sufficient manpower to arrest Salazar using safe procedures.

3. Given that DiPaolo and Walton did not adhere to their claimed, initial plan of surveillance only, DiPaolo and Walton intended from the outset to apprehend Salazar, "regardless of whether [he] walked, ran, or got into a vehicle." Thus, their conduct was not consistent with the claimed plan.

4. DiPaolo and Walton each should have worn his raid jacket and had his badge in plain view the first time they approached Salazar's vehicle.

5. Due to the foregoing, DiPaolo and Walton did not follow standard police practices when individually or collectively they decided to approach the vehicle, which Salazar had entered, when both were not wearing raid jackets and displaying their badges.

b.      Flynn testified to the following at trial:

1. During surveillance, the Marshals behaved appropriately in minimizing the likelihood that they would be recognized as law enforcement. However, as soon as they decided that they might make an arrest, they should have donned their raid jackets.

2. Sitting outside of a house is not a known and recognized practice to determine whether the home is a suspect's residence. And, even if that were the Marshals' purpose in conducting surveillance of the residence, they should have left as soon as they determined the vehicle was registered to Salazar.

3. Two Deputy Marshals should have been sufficient to apprehend Salazar in his vehicle based on the information in the Marshals' possession, *i.e.*, that he had no violent criminal history. However, additional Marshals would have been required to arrest Salazar in his home.

4. Flynn pointed to Ex. 53, U.S. Marshal Service policy directives, which state that "initial contact with the person to be arrested is very important and can be most dangerous."

5. The Marshals improperly escalated the situation by walking up to the vehicle with their guns drawn. Instead, they should have sought assistance from local law enforcement or additional Marshals to arrest Salazar.

4.      Jason DiPaolo

DiPaolo has been a Deputy U.S. Marshal since 2002. He became a member of the USMS Regional Fugitive Task Force in 2008. The Task Force was established to apprehend violent federal, state, and local fugitives. Prior to 2009, DiPaolo had primarily been assigned to apprehend violent offenders, but had also been assigned to apprehend some nonviolent ones. DiPaolo was generally a credible witness as shown through his demeanor and responsiveness to questions. However, he was inconsistent when asked about best practices when effecting an arrest of someone who is in a vehicle. He testified that he generally asks subjects to place their hands out the window or in the air, *i.e.*, away from the controls; in this case, he said he did not do so because he could already see Salazar's hands. However, the trial evidence showed that, although Salazar's hands were visible, they were on the steering wheel of his

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**

**CIVIL MINUTES – GENERAL**

| Case No. | LA CV11-10279 JAK (SPx) | | Date | May 20, 2014 |
|---|---|---|---|---|
| Title | Estate of Dominic Salazar, et al. v. United States of America, et al. | | | |

vehicle. Thus, had DiPaolo followed his normal practice, he would have directed Salazar to remove his hands from the steering wheel.

          a.       In his declaration DiPaolo states the following:

1. Ex. 50 is a true and correct copy of the warrant for Salazar's arrest.
2. Exs. 64-65 and 69-70 depict the Fox Ridge Residence as of May 6, 2009.
3. While conducting surveillance of the Fox Ridge Residence, DiPaolo and Walton made a plan to apprehend Salazar in the open if he left the house. Apprehending a fugitive in the open is generally preferable to arresting him or her in a residence because of the potential unknowns about the residence, *e.g.*, the possible presence of other persons or weapons. Apprehending a fugitive in the open is also preferable to doing so while he or she is in a vehicle because of the possibility that the fugitive may flee, which would result in a vehicle pursuit, is less likely.
4. As DiPaolo drove up to the Fox Ridge Residence, he removed his USMS badge from underneath his shirt so that it was visible.
5. DiPaolo observed Walton displaying his USMS badge at the front passenger door of the vehicle while the two of them tried to get Salazar to comply with their orders.
6. DiPaolo heard Walton yell, "Gun." At that time, he drew his weapon from his holster and moved in front of Walton.
7. After the shooting, when DiPaolo walked to the minivan to retrieve his raid jacket, he noticed that his badge had become entangled in the front buttons of his shirt. As a result, he straightened the chain and badge to ensure that it was visible.

          b.       DiPaolo testified to the following at trial:

1. DiPaolo and Walton did not leave the area of surveillance after determining Salazar owned the Infinity because they were uncertain if Salazar resided there and wanted to seek to confirm that was the case. Therefore, they remained in their vehicle in the vicinity of the residence for two hours awaiting his possible exit from the residence.
2. At some point during the two-hour period, they formulated a plan to arrest Salazar if they observed him that day. Their plan was to do so when he was in the open. However, they did not attempt to estimate how long it would take to drive from their location to the driveway of what they believed to be Salazar's residence once they observed him leaving the residence. Nor did they estimate the amount of time that would elapse from when they could first see Salazar leave the residence to when he would arrive at the vehicle in the driveway. Thus, they did not estimate how likely it was that, if they followed their plan, they could reach Salazar while he was in the open, *i.e.,* before he entered the vehicle in the driveway.
3. DiPaolo felt that using a "felony stop" procedure to arrest Salazar was not appropriate. He did not think that Salazar presented a physical threat. Salazar had no prior violent criminal history. Thus, DiPaolo felt it would have been inappropriate to have arrested Salazar by requiring that he lie on the ground. For the same reasons, DiPaolo thought that two Marshals were sufficient to arrest Salazar.
4. DiPaolo put his badge on over his shirt when he first left the minivan. He did not remember if he drew his weapon and held it at his side as he approached Salazar's vehicle or if he pushed his shirt back so that he could have ready access to the weapon.

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**

**CIVIL MINUTES – GENERAL**

| Case No. | LA CV11-10279 JAK (SPx) | | Date | May 20, 2014 |
|---|---|---|---|---|
| Title | Estate of Dominic Salazar, et al. v. United States of America, et al. | | | |

5. DiPaolo does not recall whether either he or Walton said to Salazar, "Get the F__ out of the car." He stated he probably did not, but Walton may have.

6. At the time of the events at issue, it was DiPaolo's general practice to direct a person whom he planned to arrest and who was in a vehicle to put his or her hands up or to place them outside of the window where he could see them. However, he did not direct Salazar to do either of these things during the attempt to arrest him. He stated that he did not do so because: (i) he could already see Salazar's hands by looking into the vehicle; and (ii) Salazar had been unresponsive to any prior commands by DiPaolo.

7. Less than five seconds elapsed between when DiPaolo heard Walton say "Gun," and when DiPaolo fired the shots that killed Salazar.

### 5.   Adrian Walton

Walton has been a Deputy U.S. Marshal since October 2005. He became a member of the USMS Regional Fugitive Task Force sometime in late 2008. At trial, Walton could not recall whether, in his work on the Task Force, he primarily handled violent or nonviolent fugitives, or how many Marshals generally accompanied him on arrests. Walton's credibility was reduced by his inability to recall any such details. He often answered "I don't know" or "I can't recall" to questions from Plaintiffs' counsel. Again, this affected the Court's assessment of his credibility. However, based on an overall assessment of his testimony and demeanor, the Court found him to be largely credible.

### a.   In his declaration, Walton states the following:

1. During the period of surveillance, Walton and DiPaolo decided that, if Salazar left the residence, they would attempt to apprehend him before he reached the vehicle in the driveway. He believed that this approach was preferable to apprehending Salazar in the house or in a vehicle for the same reasons stated by DiPaolo.

2. Once Deputy DiPaolo had driven the minivan to the driveway of the residence where it was blocking the Infinity, Walton removed his badge from under his shirt and got out of the minivan. He took his service weapon out of the holster and held it in his right hand on his right side.

3. Walton yelled "Gun" when he saw the handgun in Salazar's right hand.

4. After the shooting, Walton did not put on a raid jacket because he did not have one in the minivan.

### b.   Walton testified to the following at trial:

1. Walton initially saw Salazar walking on the passageway that connected an exterior door of the Fox Ridge Residence to the driveway where the Infinity was parked. Walton does not recall how long it took them to drive the minivan to the driveway after he saw Salazar. He does not recall either that the tires of the vehicle screeched or that DiPaolo "punched" the accelerator pedal.

2. Walton saw Salazar entering the Infinity as they approached the driveway. Salazar shut the door to the Infinity as the Marshals exited the minivan.

# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF CALIFORNIA

## CIVIL MINUTES – GENERAL

| Case No. | LA CV11-10279 JAK (SPx) | | Date | May 20, 2014 |
|---|---|---|---|---|
| Title | Estate of Dominic Salazar, et al. v. United States of America, et al. | | | |

3. Walton may have said, "Get the F__ out of the car" to Salazar when he was on the driver's side of the Infinity. However, he does not remember using profanity.
4. Later in the process, Walton did not try to grab Salazar's right arm when he saw the weapon in his hand.
5. Walton had a "ballistics vest" with him that day. However, he did not put it on at any time during the incident. Walton did not have his raid jacket that day. However, he also testified that he has never worn a raid jacket to apprehend a fugitive.
6. DiPaolo had his badge around his neck during the surveillance, but Walton did not observe DiPaolo's badge during the attempted arrest.

  6.  Paul Duffy

Duffy began work with the U.S. Marshals Service in 1996 as a Deputy U.S. Marshal. From 2005 to 2008 and 2009 to 2014, he served as an Inspector and Senior Inspector at the Training Academy for Marshals. During that time he taught courses in use of force, basic tactics, firearms, and law enforcement. From 2008 to 2009, he served in the Marshals' Office of Inspection (Internal Affairs). In that role he investigated allegations of misconduct and shootings involving Deputy Marshals. He is currently the Acting Chief of Basic Programs. Duffy's testimony was largely credible. His testimony lost some force when he was evasive and reluctant in answering certain of the Court's questions concerning policies and training with respect to making an arrest of a person who is in a vehicle.

  a.  In his declaration, Duffy states the following:

1. He agrees with the statements in paragraphs 11 through 26 of the trial declaration of Anthony K. Ross, who was previously designated as a trial witness. These statements include:
  a. Deputy Marshals have broad discretion in determining the means that will be used to approach, investigate, or arrest a fugitive. The discretion is exercised based on the circumstances faced by the Deputy Marshals at the time of the events.
  b. Deputy Marshals are trained to conduct surveillance in small numbers for whatever length of time is deemed appropriate by those Marshals on the scene. It is within the discretion of the Marshals to decide when it is appropriate to conclude the surveillance.
  c. Marshals are trained to perform surveillance in street clothes in unmarked vehicles so that they are not readily identified by fugitives or others as law enforcement officers.
  d. Deputy Marshals are trained to have in their possession badges that identify them as law enforcement officers. They are also trained to bring ballistic vests and raid jackets in high risk situations or for added visibility where appropriate. However, conducting surveillance while wearing a marked vest or jacket is not appropriate.
  e. Deputy Marshals are trained to arrest subjects in an area that provides the greatest disadvantage to the fugitive. Outside of a dwelling is such an area. Deputy Marshals are also trained to move quickly to apprehend a fugitive so that he or she does not flee when the Marshals have taken steps toward making an arrest.
  f. Deputy Marshals are trained to block vehicles from movement and are instructed not to engage in vehicle pursuits.
  g. Deputy Marshals are trained to take steps to enhance their own safety when there is

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**

**CIVIL MINUTES – GENERAL**

| Case No. | LA CV11-10279 JAK (SPx) | Date | May 20, 2014 |
|----------|-------------------------|------|--------------|
| Title | Estate of Dominic Salazar, et al. v. United States of America, et al. | | |

an opportunity to do so during an arrest process. For example, they can put on clothing that identifies them as law enforcement officers.

   h. Deputy Marshals are trained to take action upon the threat of violence, *e.g.*, when a suspect brandishes a weapon, and not wait for the fugitive to take steps that could result in the injury to a Deputy Marshal or others.

   i. Deputy Marshals are trained to attempt to gain physical control of a fugitive if he does not comply with a verbal command to exit a vehicle or to display his or her hands in a particular position.

   j. Deputy Marshals are trained to make a crime or arrest scene safe by recovering any weapons there and calling for police assistance.

2. U.S. Marshals Policy Directive 2.1 governs the use of force by Deputy U.S. Marshals. This directive, set forth in Ex. 51, states that "Deputy U.S. Marshals must always use the minimum force reasonably necessary to protect themselves or others from bodily harm. . ." Furthermore, "the use of force must be objectively reasonable under all the circumstances known to the deputy at the time and may range from verbal coercion to the use of firearms. If means other than deadly force appears to be sufficient to accomplish the objective, deadly force should not be used." Finally, "Deputies may use deadly force only when necessary, that is, when the deputy has a reasonable belief that the subject of such force poses an imminent danger of death or serious physical injury to the deputy or to another person."

3. U.S. Marshals Policy Directive 8.1, which is Ex. 52, governs how Deputy Marshals are to conduct investigations in the field. This directive does not include any instructions pertinent to the conduct of the Deputy Marshals in this case.

4. U.S. Marshals Police Directive 8.3, which is Ex. 53, governs the basic procedures to be used in making an arrest. This directive states that the deputy in charge should determine whether local authorities should be contacted in advance of an arrest. It also provides that, "[t]he arresting deputy shall properly identify himself or herself, preferably by exhibiting his or her badge and credentials, to the offender and by making known his or her purpose and reason for the arrest. However, this procedure is contingent upon the circumstances and physical condition of the offender." It also states that, "[t]he degree of force used is based on the totality of the circumstances confronting the deputy."

     b.     Duffy testified to the following at trial:

1. When Marshals are conducting surveillance they are not required by policy to bring clothing such as a raid jacket, which identifies them as law enforcement personnel. They are instructed to identify themselves as such, but it is within their discretion to decide whether to so by making statements, wearing clothing and/or displaying a badge.

2. Marshals who attend Fugitive Task Force training are not instructed on how to conduct a felony stop.

3. Marshals are trained to apprehend fugitives, but they have discretion to decide how best to make any particular arrest. Such discretion is exercised based on the totality of the circumstances that are presented at the time of the arrest.

4. A determination of the level of force used rests in the discretion of the Marshal.

5. There is no written policy as to how Marshals should conduct arrests of those who are in vehicles. However, Marshals are trained how to conduct such arrests. Marshals are trained to:

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**

**CIVIL MINUTES – GENERAL**

| Case No. | LA CV11-10279 JAK (SPx) | Date | May 20, 2014 |
|----------|-------------------------|------|--------------|
| Title | Estate of Dominic Salazar, et al. v. United States of America, et al. | | |

(i) have all Marshals approach the driver's side to remove the driver (or, if the only person in the car is on the passenger side, then to approach that side of the vehicle to do so); and (ii) tell the subject to keep his or her hands visible, turn off the vehicle, open the window, toss the keys out of the window, open the car door by placing his or hands outside the vehicle in order to operate the door handle, and get out of the vehicle.

6. Notwithstanding the foregoing protocols, some of which DiPaolo and Walton did not follow in this case, Duffy testified that he believes that DiPaolo and Walton acted prudently. Because Salazar's hands were visible on the steering wheel and because Salazar had been noncompliant with earlier directives by the Marshals, DiPaolo behaved appropriately in taking the opportunity, when the doors unlocked, to open the driver's side door of the vehicle and attempt to pull Salazar out of the vehicle.

## C.    Summary of Findings of Fact

Based on the foregoing discussion of the testimony and exhibits presented at trial, as well as the credibility determinations about witnesses, the Court makes the following findings:

1. Salazar failed to appear at a post-conviction sentencing hearing on March 9, 2009 and, as a result, a warrant for his arrest was issued. Ex. 50. The warrant was still outstanding on May 6, 2009.

2. A preponderance of the evidence did not show that either DiPaolo or Walton failed to wear his badge during the attempted arrest of Salazar that ended with the shooting. These badges identified them as law enforcement officers. Plaintiffs did not present any evidence contradicting Walton's statement that he was wearing a badge. At trial and in her declaration, Sanchez recalled that she saw DiPaolo putting his badge on after the shots were fired. These statements were credible as was the balance of her testimony. However, recollections can vary over time, and in her call to 9-1-1 and in her statement to the Fontana police department on May 6, 2009, Sanchez did not state that she saw DiPaolo put on his badge after the incident. Further, Sanchez's statement that she saw DiPaolo put on his badge is consistent with DiPaolo's statement that he was wearing his badge over his clothes during the attempted arrest, but later adjusted it. Thus, Sanchez may have observed this adjustment. For these reasons a preponderance of the evidence does not show that DiPaolo was not wearing his badge during the attempted arrest.

3. Both Marshals declared that prior to the shooting they identified themselves several times as law enforcement officers. Both Marshals also testified that Walton yelled "Gun" when he saw the handgun in Salazar's hand. The contrary evidence offered by Plaintiffs was not sufficient to rebut this evidence. Saldana and Sanchez each testified that she did not hear the Marshals identify themselves as law enforcement officers. Saldana also declared that she did not distinctly hear anyone yell "Gun!" Their testimony was also very credible. Saldana's testimony had particular force given her demeanor during the trial, her attentiveness to the

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**

**CIVIL MINUTES – GENERAL**

| Case No. | LA CV11-10279 JAK (SPx) | Date | May 20, 2014 |
|---|---|---|---|
| Title | Estate of Dominic Salazar, et al. v. United States of America, et al. | | |

questions posed, and her closer proximity to the driveway at the time of the incident. However, given the distances between where each was located and the driveway where the incident occurred, they may not have heard all of the exchanges between the Marshals and Salazar. Further, Saldana testified that she heard "arguing" and then heard someone yell, "Get out of the car!" The Marshals do not recall whether they yelled their commands to get out of the vehicle once its doors became unlocked. Therefore, the earlier statements in which each claims he identified himself as a law enforcement officer may have been without shouting; this would have meant that Saldana and Sanchez may not have heard them. The Court is mindful that both Marshals had an incentive to testify as they did concerning their identities as law enforcement personnel, and has considered this in the assessment of all of the evidence about whether they did so.

4. When the Marshals approached the vehicle, DiPaolo was on the driver's side, and Walton was on the passenger's side.

5. Neither Marshal was wearing a raid jacket or clothing that displayed words or other markings indicating that he was a law enforcement officer.

6. Neither Marshal ordered Salazar to lower the window of his vehicle.

7. Neither Marshal ordered Salazar to turn off the engine of the vehicle or to lower the driver's side window, remove the key from the ignition switch, and toss it outside the vehicle.

8. There were certain disparities in the Marshals' pre-trial and trial declarations. For example:

   a. As to whether Walton was wearing a badge during the attempted arrest, DiPaolo's declaration submitted in support of Defendant's motion for summary judgment (Dkt. 56-1) states, "I also observed Deputy Marshal Walton at the front passenger door of the vehicle knocking on the window and identifying himself as law enforcement." Summ. Judg. Decl. ¶ 16. His trial declaration is somewhat different. It states, "I observed Deputy Marshal Walton use his USMS badge that was hanging on a chain around his neck to knock on the front passenger door window several times." DiPaolo Trial Decl. ¶ 30.

   b. DiPaolo's declaration in support of Defendant's motion for summary judgment (Dkt. 56-1) and his trial declaration each states that he was wearing his badge outside of his shirt when he approached Salazar's vehicle. However, his declaration submitted in connection with the motion for summary judgment is silent as to whether he "adjusted" his badge after the shooting, whereas his trial declaration states that he noticed his badge had become entangled with his shirt at some point

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**

**CIVIL MINUTES – GENERAL**

| Case No. | LA CV11-10279 JAK (SPx) | Date | May 20, 2014 |
|---|---|---|---|
| Title | Estate of Dominic Salazar, et al. v. United States of America, et al. | | |

after the shooting and he then adjusted it. DiPaolo Trial Decl. ¶ 59.

c.   Walton's declaration submitted in support of Defendant's motion for summary judgment (Dkt. 56-2) is silent as to whether either Marshal ordered Salazar to exit the vehicle once its doors became unlocked because its gear shift was placed in park. However, in his trial declaration, he states, "I do not remember how many more times that I, or Deputy Marshal DiPaolo, ordered Dominic Salazar out of the vehicle once Deputy Marshal DiPaolo was able to open the driver's side door, but I remember that I said it several more times. I also do not remember whether I, or Deputy Marshal DiPaolo, had begun yelling at this point." Walton Trial Decl. ¶ 31.

d.   Walton's trial declaration states that he ordered Salazar to get out of the vehicle as he was attempting physically to remove Salazar; his declaration filed in support of Defendant's motion for summary judgment does not make this statement.

9.   Less than five seconds elapsed between when Walton yelled, "Gun," and when DiPaolo fired the first shot at Salazar.

10.   There is no written policy that instructs Marshals on the procedures to use when seeking to arrest someone who is in a vehicle. However, Marshals are trained to do the following: approach such a vehicle on the driver's side; order the subject to lower the driver's window, toss the keys to the vehicle outside through the open window and place his or her hands in full view outside of the vehicle, again by placing them in the area of the open window. At that point, they are trained to ask the subject to open the door of the vehicle from the outside.

11.   The evidence showed that Salazar had an unregistered gun in the vehicle, and that, as Walton was using force in attempting to pull Salazar out of the vehicle, Salazar picked the gun up from the center console area, and rotated as he pointed the gun in the direction of the Marshals. Plaintiffs presented no contrary evidence on this issue.[11]

---

11  The materials submitted after trial present slightly different facts. The report of the U.S. Marshal Shooting Review Board states: "The fugitive's hand was near the center console, and *the gun was pointed toward the steering wheel.* DUSM DiPaolo ordered the fugitive twice to drop the gun, but the fugitive did not comply. DUSM DiPaolo fired three rounds at the fugitive." Dkt. 117, Attachment E at 27 (italics added). This varies somewhat from the testimony to the effect that Salazar rotated as he held the gun. The San Bernardino County District Attorney's Report states: "[T]he suspect put his car in gear in an attempt to back out of the driveway. When he noticed he was blocked in by the Marshals' vehicle, he stopped. The doors remained locked. *When the suspect unlocked the car door, it appeared that he was surrendering.*" Dkt. 117, Attachment F at 37 (italics added).This is inconsistent with DiPaolo's testimony that the doors became unlocked when the car was placed in park after having been placed in reverse. At no point did DiPaolo or Walton testify that Salazar unlocked the doors to the vehicle or that he appeared to be surrendering. However, the statements in these official records that Salazar was aiming the gun at the steering

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

### CIVIL MINUTES – GENERAL

| Case No. | LA CV11-10279 JAK (SPx) | Date | May 20, 2014 |
|----------|--------------------------|------|--------------|
| Title | Estate of Dominic Salazar, et al. v. United States of America, et al. | | |

12. Plaintiffs did not present any evidence to dispute either that Salazar had an unregistered gun in the Infinity or that he placed it in his hand and rotated the weapon in the direction of the Marshals as Walton was attempting to pull him out of the vehicle. Plaintiffs also did not present any evidence that, once the Marshals saw the gun in Salazar's hand, they did not act reasonably. Thus, the key disputes are whether the Marshals' pre-shooting conduct breached their duty of care and whether they can be held liable under the FTCA for that conduct. As discussed below, California courts have held that pre-shooting conduct may support a finding of liability in a wrongful death action. However, there are issues as to whether this conduct falls within the "discretionary function" exception to the FTCA.

## IV.   Conclusions of Law

### A.   Legal Standard

#### 1.   Wrongful Death

Under the FTCA, the United States is generally liable "under circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred." 28 U.S.C. § 1346(b)(1). Under California law, to prevail on a claim for wrongful death a plaintiff must establish "the tort (negligence or other wrongful act), the resulting death and the damages consisting of the pecuniary loss suffered by the heirs." *Quiroz v. Seventh Ave. Center*, 140 Cal. App. 4th 1256, 123 (2006). In order to prove negligence, "a plaintiff must show that the defendant had a duty to use due care, that he breached that duty, and that the breach was the proximate or legal cause of the resulting injury." *Hayes v. County of San Diego*, 57 Cal. 4th 622, 629 (2013). In a wrongful death action arising from a law enforcement officer's use of deadly force, the officer has a "duty to act reasonably when using deadly force." *Id.* The "reasonableness of a peace officer's conduct must be determined in light of the totality of circumstances," from "the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Id.* at 632.

The totality of circumstances includes "pre-shooting" conduct, which itself involves the "tactical conduct and decisions employed by law enforcement preceding the use of deadly force." *Id.* at 626. In some cases, "preshooting circumstances might show that an otherwise reasonable use of deadly force was in fact unreasonable." *Id.* at 630. For example, in *Grudt v. City of Los Angeles*, 2 Cal.3d 575 (1970), the California Supreme Court addressed the issue in the context of a police officer who "in plain clothes, carrying a double-barreled shotgun approached a car, possibly causing the driver to think he was being robbed or attacked." The issue there was whether the officer could be found negligent for firing at the driver who drove the car toward a second officer who was wearing plain clothes. *Hayes*, 57 Cal.4th at 629 (citing *Grudt*, 2 Cal.3d at 581-82). The California Supreme Court held that the trial court erred in barring a

---

wheel and that he was surrendering, lack foundation; the source of the information is not provided. Assuming that they were based on statements by DiPaolo or Walton, they may be admissible as prior inconsistent statements. Fed. R. Evid. 801(d)(1). However, Plaintiff did not establish either of these bases for potential admissibility at trial.

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**

**CIVIL MINUTES – GENERAL**

| Case No. | LA CV11-10279 JAK (SPx) | Date | May 20, 2014 |
|---|---|---|---|
| Title | Estate of Dominic Salazar, et al. v. United States of America, et al. | | |

claim of negligence.

In *Hayes*, the California Supreme Court explained that the *Grudt* decision stands for the principle that, although the shooting "appeared justified if examined in isolation," the "totality of circumstances, including the preshooting conduct of the officers, might persuade a jury to find the shooting negligent." *Id.* The court then stated that, where a plaintiff does not allege a separate injury from the pre-shooting conduct of law enforcement personnel, "the preshooting conduct is only relevant . . . to the extent it shows, as part of the totality of circumstances, that the shooting itself was negligent." *Id.* at 690. Further, "the reasonableness of the officers' preshooting conduct should not be considered in isolation. Rather, it should be considered in relation to the question whether the officers' ultimate use of deadly force was reasonable." *Id.* at 691.

      2.    <u>Discretionary Function Exception</u>

          a.      The Basis for the Exception

Under *Hayes*, the "tactical conduct and decisions employed by law enforcement preceding the use of deadly force," 57 Cal.4th at 626, are to be considered as part of the determination whether the use of deadly force was reasonable. This determination is made "in light of the totality of circumstances." *Id.* at 632. In this action, the pre-shooting conduct included the manner in which the Marshals approached the Infinity, identified themselves, and attempted to arrest Salazar.

Defendant contends that, notwithstanding *Hayes*, the Court lacks jurisdiction to evaluate the pre-shooting conduct because it reflected the exercise of discretion for which there cannot be liability under the FTCA. Dkt. 119 at 6. Because Deputy Marshals have discretion regarding surveillance and arrest techniques, Defendant contends that the following decisions made in this matter were discretionary: (i) continuing to conduct surveillance after confirming that Salazar was the registered owner of the Infinity; (ii) approaching Salazar in his vehicle in an attempt to arrest him; (iii) not wearing raid jackets when approaching Salazar's vehicle; and (iv) attempting to remove Salazar from his vehicle when it became unlocked rather than ordering Salazar to exit the vehicle on his own. Defendant does not contend that the ultimate use of deadly force falls within the discretionary function exception. However, in determining whether the shooting conduct was reasonable based on pre-shooting events, Defendant contends that the Court should consider only the Marshals' nondiscretionary conduct. This includes the requirement that they identify themselves as law enforcement personnel and their actions after Walton first saw the weapon in Salazar's hand.

Under the FTCA, the United States waives its sovereign immunity with respect to certain injuries caused by government employees who are acting within the scope of their employment. 28 U.S.C. § 1346(b). However, there is no waiver of immunity for claims "based upon the exercise or performance or the failure to exercise or perform a discretionary function." 28 U.S.C. § 2680(a). This exception applies "whether or not the discretion involved be abused." *Id.* If the discretionary function exception applies to the challenged government conduct, the United States retains its sovereign immunity, and the district court lacks subject matter jurisdiction over that claim. *See GATX/Airlog Co. v. United States*, 286 F.3d 1168, 1173 (9th Cir. 2002).

A two-part test governs the determination whether the discretionary function exception applies. First, a

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**

**CIVIL MINUTES – GENERAL**

| Case No. | LA CV11-10279 JAK (SPx) | Date | May 20, 2014 |
|---|---|---|---|
| Title | Estate of Dominic Salazar, et al. v. United States of America, et al. | | |

court examines whether the challenged conduct is discretionary -- that is, whether it involved "an element of judgment or choice." *Berkovitz v. United States,* 486 U.S. 531, 536 (1988). Judgment or choice is absent "when a federal statute, regulation, or policy specifically prescribes a course of action for an employee to follow." *Id.* Second, if the conduct involves judgment or choice, the court must "determine whether that judgment is of the kind that the discretionary function exception was designed to shield." *Id.* "The primary focus of the second part of the test is on 'the nature of the actions taken and on whether they are susceptible to policy analysis,'" *Fang v. United States*, 140 F.3d 1238 (9th Cir. 1998), and "involve a 'decision grounded in social, economic, and political policy.'" *O'Toole v. United States*, 295 F.3d 1029, 20134 (9th Cir. 2002).

> b.      Scope of the Discretionary Function Exception

The Ninth Circuit has recognized that determining whether an action is "susceptible to a policy analysis grounded in social, economic, or political concerns . . . can be difficult." *O'Toole v. United States*, 295 F.3d 1029, 1035 (9th Cir. 2002). A brief review of relevant case law regarding the application of the discretionary function exception provides the context for the determination of the issue in this case.

*Garcia v. United States*, 826 F.2d 806 (9th Cir. 1987) addressed whether a shooting by a border patrol officer of a person attempting illegally to enter the United States fell within the discretionary function exception. The court concluded that "[w]hile law enforcement involves exercise of a certain amount of discretion on the part of individual officers, such decisions do not involve the sort of generalized social, economic and political policy choices that Congress intended to exempt from tort liability." 826 F.2d at 809. Thus, the court concluded that the officer's actions did not fall within the discretionary function exception.

After *Garcia*, the Supreme Court decided *Berkovitz*, 486 U.S. at 536, and *United States v. Gaubert*, 499 U.S. 315 (1991). In those cases, the Court emphasized that the discretionary function exception applies not just to "planning-level decisions" and the "promulgation of regulations," but to the "day-to-day" actions of government actors. *Gaubert*, 499 U.S. at 323-25. Furthermore, *Gaubert* held that "[w]hen established governmental policy . . . allows a Government agent to exercise discretion, it must be presumed that the agent's acts are grounded in policy when exercising that discretion." *Id.* at 324.

The Ninth Circuit has concluded in several cases that the actions of federal law enforcement and other ground-level government employees that were taken as part of the discretion afforded them by agency policy were subject to the discretionary function exception. For example, in *Weissich v. United States*, 4 F.3d 810 (1993), the Ninth Circuit concluded that the decision of officers of the Bureau of Alcohol, Tobacco and Firearms ("ATF") not to warn a prosecutor of the impending threat posed by a person who was on federal probation fell within the discretionary function exception. The court noted that relevant agency guidelines granted discretion to officers to determine when and how to warn a third party of a "reasonably foreseeable" risk of harm that could be caused to that person by a probationer. *Id.* at 813-14. Because these guidelines required officers to balance the competing obligations to "(1) protect the public, and (2) promote the rehabilitation of the probationer," the decisions of the ATF officers were deemed grounded in policy judgments, thereby warranting the application of the exception. *Id.* at 814.

*Sabow v. United States*, 93 F.3d 1445 (9th Cir. 1996) addressed whether an allegedly negligent

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

### CIVIL MINUTES – GENERAL

| Case No. | LA CV11-10279 JAK (SPx) | Date | May 20, 2014 |
|---|---|---|---|
| Title | Estate of Dominic Salazar, et al. v. United States of America, et al. | | |

investigation, *i.e.*, a failure to secure crime scene and critical evidence, by officers in the Naval Investigative Service ("NIS") and the Office of the Judge Advocate General ("JAG") fell within the discretionary function exception. The Ninth Circuit stated that, although the manuals of both NIS and JAG contained guidelines for how to perform investigations, their use was optional rather than mandatory. *Id.* at 1452-53. Thus, the first prong of the discretionary function test was met. The Ninth Circuit then concluded that the second prong of the test was met because "[i]nvestigations by federal law enforcement officials . . . clearly require investigative officers to consider relevant political and social circumstances in making decisions about the nature and scope of a criminal investigation." *Id.* at 1453. By contrast, the Ninth Circuit concluded that the decision of a Marine Corps General to "berate" the family of the decedent did not "involve considerations of social, economic, or political policy of the type Congress intended to shield from FTCA actions" because he "had no legitimate policy rationale for resorting to verbal abuse and an investigation of [a relative of the decedent's] medical license as a response to the possibility that complaints about the military's investigation . . . might be publicly aired." *Id.* at 1454.

In *Fang v. United States*, 140 F.3d 1238 (9th Cir. 1998), the Ninth Circuit addressed whether the actions of emergency medical technicians ("EMTs") working in Sequoia National Park fell within the discretionary function exception. The issue arose in the context of a response by EMTs to a motor vehicle accident and their alleged failure to stabilize the spine of a victim, properly administer CPR, and bring certain equipment to the scene. The Ninth Circuit concluded that the conduct was discretionary because the EMT protocols did not clearly apply to the actions of the EMTs, or left certain decision-making to the EMTs based on their professional expertise. *Id.* at 1243. However, the court then concluded that the failure of EMTs properly to stabilize the victim's spine and administer CPR did not satisfy the second prong of the test. The court reasoned that "[n]o social, economic, or political policy is implicated in the decision whether to stabilize the spine of a person who may have suffered a head, neck, or back injury prior to treatment. This is simply an ordinary judgment made by EMTs in applying their training and expertise to an emergency situation." *Id.* By contrast, plaintiff's claim that additional equipment should have been kept at the EMT station was barred by the discretionary function exception because the decision as to which stations have which emergency equipment was based on a policy judgment regarding "how best to allocate available resources throughout various park locations." *Id.*

*O'Toole v. United States*, 295 F.3d 1029 (9th Cir. 2002) is similar. There, the Ninth Circuit held that a decision by the Bureau of Indian Affairs "to forgo, for fiscal reasons, the routine maintenance of its property . . . is not the kind of policy decision that the discretionary function exception protects." *Id.* at 1036. The court recognized the danger that the exception could swallow the rule, and noted that "in order to effectuate Congress's intent to compensate individuals harmed by government negligence, the FTCA, as a remedial statute, should be construed liberally, and its exceptions should be read narrowly." *Id.* at 1037.

*Alfrey v. United States*, 276 F.3d 557 (9th Cir. 2002) addressed the exception in the context of claims brought against prison officials by the heirs of an inmate who was killed by his cellmate. The plaintiff alleged that the inmate reported to prison officials that his cellmate had threatened him. The plaintiff's claim was predicated, in part, on the failure of the prison officials to conduct a search of the cell after the complaint by the victim. The theory was that such a search would have led to the discovery and confiscation of the weapon that was used in the killing.

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

### CIVIL MINUTES – GENERAL

| Case No. | LA CV11-10279 JAK (SPx) | Date | May 20, 2014 |
|---|---|---|---|
| Title | Estate of Dominic Salazar, et al. v. United States of America, et al. | | |

The court held that the discretionary function exception barred an FTCA claim based on the failure to search the cell. It concluded that a "prison official's judgment about how extensively to search a cell involves a balancing of the potential risk, on the one hand, against the inmate's interest in being free from overly intrusive searches, on the other. . . . Those types of decisions implicate social and public-policy considerations." *Id.* at 565. The court distinguished these decisions from ones that "involve[] merely occupational or professional judgment," like those in *Fang*, which are not protected by the discretionary-function exception. *Id.* at 566 (citing *Sigman*, 217 F.3d at 796). Decisions that are not protected by the exception include ones that are "analogous to functions performed by professionals in the private sphere every day." *Id.* In contrast, the decisions by the prison officials in *Alfrey* about whether to perform a cell search and how to respond to a report of inmate misconduct had no private sector analogues. Further, federal regulations granted prison officials discretion to determine how to search a cell and respond to such a claimed threat. And, there were no external professional standards, *i.e.*, medical or other professional standards, that dictated whether and how to perform the search of a prison cell. *Id.*

Other circuits have addressed whether the discretionary function exception applies to the decision of a federal law enforcement officer concerning how to make an arrest. In *Hart v. United States*, 630 F.3d 1085, 1090 (8th Cir. 2011), the issue was whether an officer of the Bureau of Indian Affairs ("BIA") was liable for the suicide of an arrestee. The death occurred after the BIA officer detained the decedent near his home, but then consented to his request to go into his house before he was transported to a jail. The decedent then entered the house and killed himself. In the subsequent FTCA action, the plaintiff argued that the BIA officer had failed adequately to supervise, secure, and detain the arrestee. The Eighth Circuit held that the decision to permit the return to the home was discretionary because the BIA Handbook granted officers discretion regarding how much control to exercise during an arrest. *Id.* at 1090. The Eighth Circuit then concluded that the second prong of the discretionary function test was met because "[the officer was] required to consider his training, the need to restrain [the arrestee], concern for [the arrestee's] safety, the public's safety, his available resources, and the information at hand in determining the proper course of action." *Id.* at 1091 (quoting *Williams v. United States,* 314 Fed.Appx. 253, 257–58 (11th Cir.2009)). All of these factors indicated that "the decision regarding how to best effectuate an arrest warrant is 'fundamentally rooted in policy considerations, and that judicial second-guessing of this decision thus is not appropriate.'" *Id.*

*Mesa v. United States*, 123 F.3d 1435 (11th Cir. 1997) arose out of the service of an arrest warrant on the wrong person. The plaintiffs argued that the law enforcement officers "failed to properly ascertain the identity of the person on whom the arrest warrant was served." *Id.* at 1436. The court "readily conclude[d] that the decisions regarding how to locate and identify the subject of an arrest warrant and regarding whether the person apprehended is in fact the person named in the warrant are discretionary in nature and involve an element of judgment or choice." *Id.* at 1438. As to the second prong of the test, the court determined that these decisions were susceptible to policy analysis because

> in deciding how extensively to investigate the location and identity of the subject, agents may weigh the urgency of apprehending the subject in light of such factors as the potential threat the subject poses to public safety and the likelihood that the subject may destroy evidence. A desire to keep the investigation secret—for tactical reasons, to protect confidential sources, to protect the agents involved, or for other reasons—may also factor

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**

**CIVIL MINUTES – GENERAL**

| Case No. | LA CV11-10279 JAK (SPx) | Date | May 20, 2014 |
|---|---|---|---|
| Title | Estate of Dominic Salazar, et al. v. United States of America, et al. |

into the decision as to how to locate and identify the subject of a warrant. In addition, agents may consider their available resources and decide how to allocate those resources among the many investigations for which they are responsible. All of these factors indicate that the decision regarding how to locate and identify the subject of an arrest warrant is fundamentally rooted in policy considerations, and that judicial second-guessing of this decision thus is not appropriate.

*Id.* at 1438.

    **B.**    **Application**

        1.    <u>Whether the Actions were Discretionary</u>

Defendant concedes that U.S. Marshal Service Policy Directive 8.3 requires Deputy Marshals to identify themselves in the course of an arrest. Thus, whether the Marshals identified themselves can be considered in determining how the pre-shooting conduct reflects on the ultimate use of deadly force. However, this policy provides that the manner in which a Marshal identifies himself or herself is left to the discretion of the Marshal:

    The arresting deputy shall properly identify himself or herself, preferably by exhibiting his or her badge and credentials, to the offender and by making known his or her purpose and reason for the arrest. However, this procedure is contingent upon the circumstances and physical condition of the offender.

Trial Ex. 53-001. Under this standard, there is no mandatory process by which the Marshals were to identify themselves. They had the discretion to elect to do so verbally and could elect to do so by showing their badges to Salazar. They were not required to wear raid jackets or other indicia of their law enforcement status.

The decisions about surveillance, the planned arrest of Salazar and the use of force were also discretionary. There are several U.S. Marshal Service Policy Directives that provide guidance as to how Marshals should conduct surveillance; others address how to make arrests. Other directives address the use of force by Marshals, including what level of force may be appropriate. *See* Trial Ex. 51, Trial Ex. 52, Trial Ex. 53. The testimony of Paul Duffy, the Acting Chief of Basic Programs for USMS, as well as the language of the policies themselves, show that these directives suggest, but do not require, particular conduct.

Duffy testified that there are no relevant, mandatory USMS policies about how to conduct surveillance of, or to arrest, a fugitive. Rather, Deputy Marshals have discretion in deciding when to end surveillance of fugitive and how to approach and attempt to arrest him or her. Duffy Decl. ¶ 8 (adopting paragraphs 11-26 of the declaration of Anthony Ross); Ross. Decl. ¶ 14 ("Deputy Marshals are granted broad discretion regarding the means to use to approach a fugitive, investigate a fugitive's location, or to execute an arrest warrant based on the fluid circumstances Deputy Marshals face in the field."); Ross Decl. ¶ 16 ("It is within the Deputy Marshal's discretion when and how to begin or end surveillance.").

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**

**CIVIL MINUTES – GENERAL**

| Case No. | LA CV11-10279 JAK (SPx) | Date | May 20, 2014 |
|---|---|---|---|
| Title | Estate of Dominic Salazar, et al. v. United States of America, et al. | | |

Policy Directive 8.3 states that, when approaching the person to be arrested, "the arresting deputy should be forceful to the extent necessary to control the situation. *Id.* "The degree of force used is based on the totality of the circumstances confronting the deputy." *Id.* This language does not direct any specific, mandatory conduct. Therefore, it again and recognizes that a Marshal may exercise discretion in determining what force may be necessary in light of the specific circumstances that are presented. *See Sabow*, 93 F.3d at 1452-53 (1996) (NIS and JAG investigative guidelines containing discretionary language were suggestive rather than mandatory); *Marlys Bear Med. v. U.S. ex rel. Sec'y of Dep't of Interior*, 241 F.3d 1208, 1213 (9th Cir. 2001) ("Discretion may be either affirmatively conferred or tacitly implied.").

The Marshals did not have unbridled discretion. Rather, it was limited by the Constitution and by certain requirements in USMS Directives, *i.e.*, that any use of force be objectively reasonable. *See Xue Lu v. Powell*, 621 F.3d 944, 950 (9th Cir. 2010) (governmental conduct cannot be discretionary if it is "'specifically prescribed by a federal statute, regulation, or policy,' because such an action is not within an agent's discretion."); *Galvin v. Hay*, 374 F.3d 739, 758 (9th Cir. 2004) ("[F]ederal officials do not possess discretion to violate constitutional rights."). Thus, actions by the Marshals that exceeded the scope of their authority would not be subject to the discretionary function exception. *Thames Shipyard & Repair Co. v. United States,* 350 F.3d 247, 254 (1st Cir.2003); *see also Nurse v. United States*, 226 F.3d 996, 1002 (9th Cir. 2000). Moreover, 28 U.S.C. § 2680(h) specifically waives sovereign immunity for claims arising out of assault and battery by an investigative or law enforcement officer.

Plaintiffs have failed to point to any constitutional right or federal statute, regulation, or policy that was violated by the pre-shooting conduct of the Marshals. And, a preponderance of the evidence showed that they acted within the scope of their authority in conducting surveillance of Salazar, deciding to arrest him and seeking to make the arrest. Thus, with the exception of the mandatory requirement that the Deputy Marshals identify themselves in some manner, the decisions of the Deputy Marshals in choosing to arrest Salazar and how they effectuated the arrest clearly involved "an element of judgment or choice." *Berkovitz,* 486 U.S. at 536; *accord Alfrey*, 276 F.3d at 565 (prison officials' search of a cell was discretionary where federal regulations gave them discretion regarding how to respond to reports of threats by inmates and conduct cell searches); *Fang*, 140 F.3d at 1243 (protocols which provided outline of CPR procedure but did not mandate a certain technique gave EMTs discretion to determine how best to administer CPR); *Sabow*, 93 F.3d at 1452-53 (officers' decision how to investigate the death of Marine Corps officer was discretionary where NIS and JAG manuals provided suggestive, rather than mandatory, guidelines for investigation); *Hart*, 630 F.3d at 1090 (failure to restrain arrestee was discretionary where BIA handbook granted discretion regarding how much control an officer should exercise during an arrest). For these reasons, neither DiPaolo nor Walton violated any mandatory USMS directives; rather, each exercised discretion regarding how to conduct the surveillance of, approach, and seek to arrest, Salazar.

2.    Whether These Actions were Grounded in Policy Considerations

Plaintiffs argue that, even if the challenged conduct was the result of decisions on which the Marshals had discretion, the second part of the discretionary function test was not shown. Thus, Plaintiffs argue that the actions taken by the Deputy Marshals did not involve "considerations of social, economic, or political policy." *See Sabow*, 93 F.3d at 1451 (quoting *In re Glacier Bay*, 71 F.3d 1447, 1450 (9th Cir.

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**

**CIVIL MINUTES – GENERAL**

| Case No. | LA CV11-10279 JAK (SPx) | Date | May 20, 2014 |
|---|---|---|---|
| Title | Estate of Dominic Salazar, et al. v. United States of America, et al. | | |

1995)).

                    a.      Decision to Continue Surveillance and to Arrest Salazar in his Vehicle

"When established governmental policy, as expressed or implied by statute, regulation, or agency guidelines, allows a Government agent to exercise discretion, it must be presumed that the agent's acts are grounded in policy when exercising that discretion." *See United States v. Gaubert*, 499 U.S. 315, 324 (1991). The USMS Policy Directives grant considerable discretion to Marshals regarding where and when to seek to arrest a fugitive pursuant to a warrant. *See* Trial Ex. 53-002, USMS Policy Directive 8.3G ("The warrant may be executed at any place within the jurisdiction of the United States."); *id.*, USMS Policy Directive 8.3.B.2 ("[W]herever possible, an arrest should be effected by sufficient law enforcement personnel to insure the safety of all participants. . ."); *id.*, USMS Policy Directive 8.3.B.3 ("The deputy in charge of planning the arrest will consider whether circumstances dictate informing the local authorities in advance. . ."). Because these Directives grant the Deputy Marshals discretion regarding how to conduct surveillance and to make an arrest, it is presumed that the Marshals' decision to arrest Salazar in his vehicle, rather than leave and return at a later time with additional USMS or local law enforcement personnel, are ones grounded in policy. Plaintiffs have not presented any evidence that rebuts this presumption.

Even without the presumption that the decisions were made to serve policy interests, the result would be the same. The evidence showed that the decision by the Marshals to change their initial plan -- to conduct surveillance to confirm Salazar's location -- to one in which they would seek to arrest him that day if he appeared outside the Fox Ridge Residence, was grounded in policy. Their new decision involved a balancing of the needs to conserve USMS resources and assure community and officer safety. The USMS Directives state that social considerations should underlie decisions made pursuant to their provisions. They emphasize that a Marshall has a duty to "carry out [an] arrest effectively" in a "location which offers as few avenues of escape as possible," while also doing so "with maximum safety" and "avoid[ing] the use of unnecessary force or wanton severity." USMS Directive 8.3.B.3-B.7. Marshals are given discretion in applying these principles, including "whether circumstances dictate informing the local authorities." *Id.* Thus, the Marshals' decision to arrest Salazar outside of the Fox Ridge Residence involved discretionary choices grounded in policy. That the decision was grounded in policy is confirmed by *Mesa.* 123 F.3d at 1438 (decision-making about whether to make an arrest involves weighing the urgency of apprehending the subject in light of public safety risks as well an appropriate allocation of law enforcement resources among investigations); *accord Hart*, 630 F.3d at 1090 (discretionary function exception applied because "[the officer was] required to consider his training, the need to restrain [the arrestee], concern for [the arrestee's] safety, the public's safety, his available resources, and the information at hand in determining the proper course of action.").

The Policy Directives do not address surveillance techniques. However, the decision by the Marshals to continue surveillance of the Fox Ridge Residence after confirming that the Infinity was registered to Salazar was based in the same policy considerations discussed above. *See Mesa*, 123 F.3d at 1438 ("The decision as to how to locate and identify the subject of an arrest warrant prior to service of the warrant is susceptible to policy analysis."); *accord Sabow*, 93 F.3d at 1453 ("[i]nvestigations by federal law enforcement officials . . . clearly require investigative officers to consider relevant political and social circumstances in making decisions about the nature and scope of a criminal investigation."); *Alfrey*, 27

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**

**CIVIL MINUTES – GENERAL**

| Case No. | LA CV11-10279 JAK (SPx) | Date | May 20, 2014 |
|----------|-------------------------|------|--------------|
| Title | Estate of Dominic Salazar, et al. v. United States of America, et al. | | |

F.3d at 565-66 ("prison official's judgment about how extensively to search a cell involves a balancing of the potential risk, on the one hand, against the inmate's interest in being free from overly intrusive searches, on the other. . . ." Such a decision does not "involve[] merely occupational or professional judgment.")

For these reasons, the decisions to continue surveillance and then to seek to arrest Salazar fall within the discretionary function exception. Therefore, these pre-shooting actions cannot form an independent basis for liability in determining whether DiPaolo's use of deadly force was reasonable.

      b.      Failure to Wear Raid Jackets When Approaching Salazar's Vehicle

An express policy granted DiPaolo and Walton discretion regarding when and how to seek to arrest Salazar. And, the discretionary function exception shields such decisions from liability. *See Gaubert*, 499 U.S. at 324. The USMS regulations expressly provide that Deputy Marshals have discretion in determining how to identify themselves as law enforcement officers to potential arrestees. *See* Trial Ex. 53-001. Therefore, the decision by DiPaolo and Walton to identify themselves as law enforcement personnel by their statements to Salazar while they were displaying their badges, but without wearing raid jackets, is presumed to fall within the discretionary function exception to the FTCA.

The Defendant presented evidence with respect to the policy considerations that are served by granting such discretion. Thus, each Marshal declared that his decision not to wear a raid jacket involved the need to avoid detection by Salazar during the surveillance, which could have led him to attempt to flee. They also declared that they had to decide if there was time to don their jackets during the short time available for them to drive from the location of the surveillance to the driveway where they could intercept Salazar before he entered his vehicle. They also had to consider whether taking the time to do so would have served officer safety and increased the risk of flight by Salazar. Thus, they declare that they had to decide if taking the time to put on their jackets would have served their concerns for safety as well as their desire to arrest Salazar. *See* DiPaolo Decl. ¶ 11 (explaining the rationale for not wearing a uniform during surveillance); Walton Decl. ¶ 5 (same).

For these reasons, this decision is also susceptible to a policy analysis. Therefore, it is within the discretionary function exception to the FTCA and cannot form a basis for liability.

      c.      Failure to follow USMS Training when Making the Vehicle Arrest

Absent a specific policy as to a particular action taken by a Marshal, there is no corresponding presumption that such an action satisfies the policy element of the discretionary function exception. Duffy testified that there is no written policy regarding how Marshals should attempt to arrest a subject who is in a vehicle. In response to the Court's question about whether Marshals receive training on this topic, he eventually testified that Marshals are trained to do the following when a subject is alone in a vehicle and in the driver's seat: (1) both Marshals approach the driver's side door and speak to the subject; (2) they should tell the subject to show his hands and keep them where the Marshals can see them; (3) they should then tell the subject to lower the window of the driver's door, turn off the engine, toss the keys to the vehicle out of the window and place his or her hands outside the vehicle; and (4) they should then instruct the subject to exit the vehicle. Because this training was not reflected in any manual or other

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**

**CIVIL MINUTES – GENERAL**

| Case No. | LA CV11-10279 JAK (SPx) | | Date | May 20, 2014 |
|----------|-------------------------|---|------|--------------|
| Title | Estate of Dominic Salazar, et al. v. United States of America, et al. | | | |

guideline, it is not the basis for a presumption as to the policy element of the exemption.

As noted, the determination whether an action is "susceptible to a policy analysis grounded in social, economic, or political concerns . . . can be difficult." *O'Toole v. United States*, 295 F.3d 1029, 1035 (9th Cir. 2002). On one end of the spectrum are agency decisions "totally divorced from the sphere of policy analysis," like the decision of a government official to run a red light, *id.*, or the decision of an EMT whether to stabilize the spine of a person who may have suffered a neck injury. *See Fang*, 140 F.3d at 1243. Such actions are simply "ordinary occupational or professional judgments" which are not protected by the discretionary function exception. *Alfrey v. United States*, 276 U.S. 557, 566 (2002); *Sigman v. United States*, 217 F.3d 785, 795-96 (9th Cir. 2000) (discretionary function exception does not apply when "the claim is for negligence in performing a function that is analogous to functions performed by professionals in the private sphere every day.").

"At the other extreme are those agency actions fully grounded in regulatory policy, where the government employee's exercise of judgment is directly related to effectuating agency policy goals." *O'Toole*, 295 U.S. at 1035. Actions like "the release of vaccine lots by the Bureau of Biologics of the Food and Drug Administration . . . and the enforcement and implementation of airline safety standards by the Federal Aeronautics Agency . . . are the kinds of decisions Congress empowered agencies to make and which the discretionary function exception shields from liability." *Id.*

The actions of the Deputy Marshals in attempting to arrest Salazar were not ones that reflected an exercise of "ordinary occupational or professional judgment." *Alfrey*, 276 F.3d at 566. Thus, attempting to arrest a fugitive does not have a civilian analogue. It is similar to a decision by a prison official about whether to search a cell, which is a "core prison function[] for which there [is] no private-sector analogue." *Id.*[12] The result here is the same. Making an arrest is a "core" function of the USMS for which there is no private-sector analogue. In contrast, there are civilian analogues to a Park Service employee who provides emergency medical care to a person injured in a motor vehicle accident. *Fang*, 140 F.3d at 1243. Once the Marshals chose to arrest Salazar, their decisions on how to proceed included whether to use a loudspeaker to order Salazar out of the vehicle and to follow some or all the methods about which Dufy testified.

The Court finds that the decisions about what steps to take in the attempted arrest of Salazar were grounded in policy. They involved balancing the safety risks to those nearby and to the officers, against Salazar's right to be free from excessive force and unreasonable seizure. These types of judgments "implicate social and public-policy considerations." *Alfrey*, 276 U.S. at 565 ("A prison official's judgment about how extensively to search a cell involves a balancing of the potential risk, on the one hand, against the inmate's interest in being free from overly intrusive searches, on the other."); *Hart*, 630 F.3d at 1090-91.

Even if the Court were to consider the conduct of the Marshals in evaluating the reasonableness of the

---

12 *Alfrey* also found these actions to be within the discretionary function exception because federal regulations granted prison officials discretion about conducting a search of a cell. Although there are no policy directives that apply to Marshals with respect to arresting a subject who is in a vehicle, the USMS guidelines grant broad discretion to Marshals in determining, in general, how to make an arrest.

**UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA**

**CIVIL MINUTES – GENERAL**

| Case No. | LA CV11-10279 JAK (SPx) | | Date | May 20, 2014 |
|---|---|---|---|---|
| Title | Estate of Dominic Salazar, et al. v. United States of America, et al. | | | |

use of force, the totality of circumstances here would not support a finding of liability. Thus, it was not shown that, had the Marshals followed the precise steps about which Duffy testified for attempting to arrest a subject who is in a vehicle, the outcome would have been different. Both DiPaolo and Walton testified that Salazar did not comply with their repeated commands that he exit the vehicle. Instead, he ignored their commands and stared straight ahead. And, Plaintiffs presented no evidence that Salazar would have complied had both of the Marshals first approached the driver's side of the vehicle and directed him to remove his hands from the wheel, lower his window, toss his keys out the window, open the driver's door and exit the vehicle.

        d.       Failure to Use Felony Stop

Plaintiffs presented evidence through the testimony of Flynn that DiPaolo and Walton should have called for additional law enforcement assistance in seeking to arrest Salazar, including the possible use of a "felony stop." Under this method, a law enforcement official uses a loudspeaker to order a subject to exit his or her vehicle and lie face-down on the ground. Whether to have used this approach comes within the same discretionary and policy decision described above. Again, a Marshal has discretion in determining how to make an arrest. And, that policy considerations are involved in deciding whether to use a felony stop is shown by DiPaolo's testimony. He stated that felony stops are used "to minimize the risk to [officers] and the public" and avoid a "violent confrontation with the subject in the car." However, DiPaolo testified that he concluded that a felony stop was not appropriate in Salazar's case because he was not a violent felon, had no prior criminal history, had no history of weapons possession, and had no weapons registered to him. In this context, DiPaolo felt that attempting a felony stop, which would have included the requirement that Salazar lie flat on the ground, was not appropriate.

DiPaolo's testimony demonstrates the policy considerations involved in determining whether to attempt a felony stop. As with the actions described previously, law enforcement officers must balance the need for community safety and the appropriateness of a more aggressive arrest method. *Accord Hart*, 630 F.3d at 1091 ("[The agent is] required to consider his training, the need to restrain [the arrestee], concern for [the arrestee's] safety, the public's safety, his available resources, and the information at hand in determining the proper course of action. All of these factors indicate that the decision regarding how to best effectuate an arrest warrant is 'fundamentally rooted in policy considerations, and that judicial second-guessing of this decision thus is not appropriate.'").

Furthermore, Plaintiffs presented no evidence that the failure to use the felony stop method was a deviation from USMS policy. DiPaolo and Duffy each testified on cross-examination regarding his knowledge of the felony stop method. Each also testified that Marshals are not required to use this method in apprehending a fugitive, and that this method would not have been appropriate in this case given that Salazar had no history of violence or possession of weapons. Furthermore, Plaintiffs' expert never mentioned the felony stop method in his testimony or trial declaration. Indeed, Flynn testified that, "once [Salazar] was in the vehicle, I don't have a problem expertise-wise, procedure-wise as going up and trying to get him out of the vehicle—extract him, have him come out." Nor did Plaintiffs make any showing that, had a felony stop been attempted, Salazar would have complied with the commands made through a loudspeaker -- commands that he ignored when made by the Marshals using loud voices.

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**

**CIVIL MINUTES – GENERAL**

| Case No. | LA CV11-10279 JAK (SPx) | Date | May 20, 2014 |
|---|---|---|---|
| Title | Estate of Dominic Salazar, et al. v. United States of America, et al. | | |

3.   Whether the Marshals Breached their Duty to Act Reasonably When Using Deadly
      Force

Although Defendant may not be held liable for the pre-shooting, discretionary tactical decisions of the
Marshals, the circumstances surrounding, and the results of, these decisions may be considered in
determining whether the ultimate use of deadly force was reasonable. The issue is whether Deputy
DiPaolo breached his "duty to act reasonably when using deadly force" from the "perspective of a
reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Hayes,* 57 Cal. 4th at 629
(2013). In applying this test, a court is to consider the " 'the totality of the circumstances at the time,'
including 'the severity of the crime at issue, whether the plaintiff posed a reasonable threat to the safety of
the officer or others, and whether the plaintiff was actively resisting detention or attempting to escape.'"
*Hernandez v. City of Pomona,* 46 Cal. 4th 501, 514 (2009).

Evidence was presented that supported the claim that, prior to seeing the handgun, DiPaolo believed
Salazar would be non-violent and cooperative. Salazar had no violent criminal history. Indeed, prior to his
arrest for the possession of child pornography, he had no criminal history at all. Further, DiPaolo's
investigation of Salazar did not show that any weapons were registered to him. The conclusion that
Salazar did not present a risk of violence was confirmed during the discussions that DiPaolo had with the
officer who arrested Salazar for the possession charge. One of these occurred prior to day on which the
surveillance and attempted arrest occurred, and the other took place while DiPaolo was conducting the
surveillance of the Fox Ridge Residence.

Defendant presented substantial evidence that supported the claim that DiPaolo's use of deadly force
was reasonable. For example, Deputy Walton testified that, as he was attempting to remove Salazar from
the Infinity, he saw a gun in Salazar's right hand near the center console of the car. He then yelled "Gun,"
and began to get out of the vehicle. Deputy DiPaolo testified that, upon hearing Walton yell "Gun," he
moved in front of Walton with his weapon drawn. He then saw the gun in Salazar's right hand and
witnessed Salazar turn his body, and the gun, in the direction of the Marshals. Although DiPaolo ordered
him to drop the gun, Salazar did not do so. Both Marshals testified that, upon seeing the handgun, each
was in immediate fear for his life because he believed Salazar intended to shoot them. Plaintiffs have
offered no evidence to rebut the testimony of DiPaolo and Walton regarding Salazar holding the gun and
turning to point it in the direction of the Marshals.

A "simple statement by an officer that he fears for his safety or the safety of others is not enough" to show
that use of deadly force was reasonable. *Deorle v. Rutherford,* 272 F.3d 1272, 1281 (9th Cir. 2001).
Rather, "there must be objective factors to justify such a concern." *Id.* Such objective factors were present
here. The Marshals did not expect Salazar to have a weapon or to act with violence when they sought to
arrest him. However, the landscape changed immediately when Walton yelled "Gun," saw the handgun in
Salazar's hand, and observed Salazar point the gun toward the Marshals. At that point it was reasonable
for DiPaolo to believe that Salazar posed an imminent threat for several reasons.

*First*, Salazar's prior actions during the attempted arrest supported the view that he was unlikely to
comply with any further commands from DiPaolo or Walton. Salazar did not comply with the prior orders
to exit the vehicle. Rather, he started the vehicle and moved it slightly. Salazar also did not obey the
instruction to unlock the doors of the vehicle.

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**

**CIVIL MINUTES – GENERAL**

| Case No. | LA CV11-10279 JAK (SPx) | Date | May 20, 2014 |
|---|---|---|---|
| Title | Estate of Dominic Salazar, et al. v. United States of America, et al. | | |

*Second*, DiPaolo and Walton were in close proximity to Salazar when he moved the gun in their direction. As a result, the Marshals had little time to take other, non-deadly actions.

*Third*, Salazar did not comply with DiPaolo's order to drop the weapon. Thus, it was reasonable for DiPaolo to conclude, during the short time period that was available, that Salazar intended to shoot at the Marshals. Given these circumstances, DiPaolo's use of deadly force was reasonable. *See Brown v. Ransweiler*, 171 Cal. App. 4th 516, 528 (2009) ("[A]n officer may reasonably use deadly force when he or she confronts an armed suspect in close proximity whose actions indicate an intent to attack."); *Billington v. Smith*, 292 F.3d 1177, 1185 (9th Cir. 2002) (under Fourth Amendment jurisprudence, it was reasonable for police officer to use deadly force where the decedent was "actively, violently, and successfully" resisting arrest and tried to grab the police officer's gun).

Considering the pre-shooting conduct of the Marshals that does not fall within the discretionary function exception to the FTCA does not change the outcome. Defendant concedes that the Marshals had a mandatory duty to identify themselves as law enforcement officers when they first approached Salazar. A failure by the Marshals to do so could, under *Hayes* and *Grudt*, be a basis for liability. *See Grudt*, 2 Cal.3d at 585 (trial court erred in removing the issue of negligence from the jury where evidence could have supported the view that Grudt, driving in a high crime area late at night and hailed to a stop by police officers in plain clothes, thought he was going to be robbed and attempted to flee before being shot by one of the officers). However, Plaintiffs failed to show by a preponderance of the evidence that the Marshals did not identify themselves. Each Marshal testified credibly that both identified themselves as law enforcement officers. Each also testified that he was wearing a badge that was visible when he first approached the vehicle. Walton also testified that he placed his badge against the passenger side window. DiPaolo corroborated this testimony. DiPaolo also testified that he identified himself as a law enforcement officer when he opened the driver's side door of the vehicle when he began the attempt to remove Salazar.

Saldana credibly testified that she did not hear either of the Marshals identify himself as a law enforcement officer, but that she did hear one of them order Salazar to "get out of the car." However, this testimony is consistent with the testimony of DiPaolo and Walton that they did not shout or yell when they identified themselves because they were right next to the vehicle. Furthermore, Saldana testified that she was not sure she would be able to hear everything that was said during the interaction due to her location. Saldana's testimony does not show by a preponderance of the evidence that the Marshals did not identify themselves as law enforcement officers.

Sanchez testified at trial that she saw DiPaolo put on his badge after shots were fired. However, as explained above, this testimony was given somewhat less force because she did not report this observation either in the 9-1-1 call or during her interview with the Fontana police officers on May 6, 2009. Both of those reports occurred shortly after the incident and could reflect a better recollection of the events than the trial testimony that was presented almost four years later. Sanchez's testimony can also be harmonized with DiPaolo's testimony that he untangled his badge from his shirt after shots were fired. Thus, Sanchez's testimony is not sufficient to show, by a preponderance of the evidence, that DiPaolo's badge was not visible when he approached the vehicle.

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**

**CIVIL MINUTES – GENERAL**

| Case No. | LA CV11-10279 JAK (SPx) | | Date | May 20, 2014 |
|---|---|---|---|---|
| Title | Estate of Dominic Salazar, et al. v. United States of America, et al. | | | |

In the absence of sufficient evidence that Deputies DiPaolo and Walton failed to identify themselves or engage in any other, nondiscretionary pre-shooting conduct, DiPaolo's use of deadly force was reasonable under the totality of circumstances. Therefore, the Marshals did not breach their duty to use reasonable force under the circumstances.

**V.**    **Conclusion**

For the reasons stated in this Order, Plaintiffs have not established their claim by a preponderance of the evidence. A proposed judgment consistent with this Order shall be lodged by Defendants by May 29, 2014. Any objections to the proposed judgment shall be filed within 7 days from the date it was lodged.

**IT IS SO ORDERED.**

_____ :  _____

Initials of Preparer    ak